## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
**LORI JEAN ALBERTS,**                          )
                                                )
        **Plaintiff,**                          )
                                                )
        **v.**                                  )    **Civil Action No. 11-11139-DJC**
                                                )
**MICHAEL J. ASTRUE, Commissioner,**            )
**Social Security Administration,**             )
                                                )
        **Defendant.**                          )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                March 29, 2013

## I.      Introduction

        Plaintiff Lori Jean Alberts ("Alberts") filed claims for disability insurance benefits

("SSDI") and supplemental security income ("SSI") with the Social Security Administration

("SSA"). Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), Alberts brings this action for judicial review of the final decision of Defendant

Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"),

issued by an Administrative Law Judge ("ALJ") on February 18, 2011, denying her claim.

Before the Court are Alberts's Motion for Judgment on the Pleadings, D. 8, requesting reversal

or remand of the decision below, and the Commissioner's Motion to Affirm that decision, D. 11.

In her motion, Alberts claims that the ALJ erred in denying her claim because: (1) the ALJ gave

the opinions from Alberts's treating psychiatrist "minimal probative weight" without properly

supporting that decision, Pl. Mem., D. 9 at 9, and based his residual functional capacity ("RFC")

finding "entirely upon the opinions from the non-examining State agency review psychologist,"

D. 9 at 11; (2) the ALJ failed to evaluate Alberts's credibility properly, D. 9 at 14; and (3) the ALJ erred by relying on testimony offered by a vocational expert ("VE"), where the VE based his opinion on the allegedly flawed RFC provided by the ALJ, D. 9 at 18.

## II.     Factual Background

Alberts was 47 years old when she ceased working on May 16, 2008.  R. 29, 117.  She had previously worked as a telephone answering service operator and as a clerical worker. R. 36.  In her August 5, 2008 application for SSDI and SSI with the SSA, she alleged disability due to anxiety, post traumatic stress disorder ("PTSD"), major depression, diabetes, high blood pressure ("HBP") and cholesterol.  R. 47, 111, 117, 146.

## III.    Procedural Background

Alberts filed claims for SSDI and SSI with the SSA on August 5, 2008, asserting that she was unable to work as of May 16, 2008.  R. 111, 117.  After initial review, her claims were denied on November 21, 2008.  R. 47.  She filed a request for reconsideration on December 18, 2008, stating that she disagreed with the initial determination because she was "unable to work due to . . . major depression, PTSD with visual and auditory hallucinations and crying spells." R. 51-52.  Her applications for SSDI and SSI were reconsidered by a state "physician and disability specialist" and both requests for reconsideration were denied on June 16, 2009.  R. 53-58.  On August 6, 2009, Alberts filed a timely request for a hearing before an ALJ pursuant to SSA regulations.  R. 59.  A hearing was held before an ALJ on February 14, 2011.  R. 24-25. Alberts was represented at the hearing by an attorney.  R. 25.  In a written decision, dated February 18, 2011, the ALJ determined that Alberts was not disabled within the definition of the Social Security Act and denied her claims.  R. 13-23.  Although the ALJ notified Alberts that the SSA's Decision Review Board ("the Board") had selected her claim for review, R. 10, the Board

did not complete its review of Alberts's claim during the requisite time period.  R. 1.

Accordingly, the ALJ's decision is the Commissioner's final decision.  R. 1.

IV.   **Discussion**

    A.   <u>**Legal Standards**</u>

        *1.   Entitlement to Disability Benefits and Supplemental Security Income*

A claimant's entitlement to SSDI and SSI turns in part on whether she has a "disability," defined in the Social Security context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process when he determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted.  20 C.F.R. § 416.920.  All five steps are not applied to every applicant; the determination may be concluded at any step along the process.  <u>Id.</u>  First, if the applicant is engaged in substantial gainful work activity, then the application is denied.  <u>Id.</u>  Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied.  <u>Id.</u>  Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted.  <u>Id.</u>  Fourth, if the applicant's RFC is such that he or she can still perform past relevant work, then the application is denied.  <u>Id.</u>  Fifth and finally, if

the applicant, given his or her RFC, education, work experience, and age, is unable to do any other work, the application is granted.  Id.

### 2. Standard of Review

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

## B. **Before the ALJ**

### 1. Medical History

Alberts presented the ALJ with extensive evidence about her medical history, including diagnoses and treatment, particularly in regard to the conditions upon which she relied in claiming a disability in her application for SSDI and SSI benefits.  Alberts listed her disabilities as "anxiety, PTSD [post traumatic stress disorder], major depression, diabetes, HBP [high blood pressure] [and] cholesterol."  R. 146.  Her basis for a hearing before an ALJ was focused on her inability to work "due to emotional and concentration problems."  R. 59.

### a) Anxiety, PTSD and Major Depression

Alberts has a history of depression and PTSD dating back to 2000.  R. 186.  An initial psychiatric evaluation, dated November 26, 2007, reported that Alberts suffered from depression

since childhood and that she was a victim of sexual abuse as a child.  R. 216-17.  The report also

noted that Alberts suffered from anxiety, panic attacks and became angry and irritable easily.  Id.

That evaluation initially assessed Alberts as suffering from PTSD, panic disorder, major

depression, recurrent and other illnesses.  R. 217.

On December 11, 2007, Alberts was examined by her primary care physician, Dr. Paul

Fallon ("Dr. Fallon") at Caritas Medical Group where she was referred to a psychiatrist after

complaining of "crying, fatigue and decreased motivation."  R. 35; 186-87.  From January 2008

through June 2009, Alberts received psychiatric counseling at Wilmington Family Counseling

Services ("WFCS").  R. 215-47, 303-23.  The record contains detailed progress notes written by

WFCS counseling staff regarding Alberts.  Id.  These notes show that Alberts's mood and

depression fluctuated over the year and a half that she received services at WFCS.  Id.  For

example, on January 17, 2008, Alberts reported "feeling up and down" and that she was "still

having crying spells . . . but [was] feeling a little better."  R. 223.  At times, the notes report that

she was "doing well" or that she was "feeling less depressed."  See, e.g., R. 239, 305-06, 313.

However, at other times the notes show Alberts was feeling "down" or "more depressed."  See,

e.g., R. 236, 241, 311.

On December 5, 2008, Dr. Fallon noted that Alberts "feels her [depression and PTSD]

symptoms are under good control."  R. 376.  On January 8, 2009, Colette April, a nurse at

WFCS, opined that "Alberts is unable to work because of her psychiatric illness," and that "[h]er

problems with concentration, energy and mood preclude her ability to sustain attention for any

reasonable amount of time."  R. 310.  The last WFCS progress note is dated June 3, 2009 and

notes that Alberts is "still doing well."  R. 305.  On January 5, 2010, at a follow-up visit with her

primary care physician, Dr. Fallon noted that Alberts continued to suffer from depression and

fatigue and had not found a new psychiatrist, but that she was sleeping well and was not suicidal. R. 356.  Dr. Fallon continued her medications prescribed by her previous psychiatrists.  R. 357.

There is a gap in the psychiatric medical records from June 2009 to February 2010.[1] From February 5, 2010 to January 11, 2011, Alberts was under the psychiatric care of Dr. Daniel Greene ("Dr. Greene") at St. Elizabeth's Medical Center.  R. 324-35, 343-50, 388-93.  In his initial evaluation of Alberts, Dr. Greene diagnosed Alberts with major depressive disorder and PTSD in remission.  R. 335.  Dr. Greene noted that Alberts had worsening depression and social anxiety, but that her medications were helping and that she displayed good coping skills.  R. 331-35.  The treatment notes from Dr. Greene indicate that Alberts's mood and depression fluctuated. R. 324-330, 337, 391-393.  At times, Dr. Greene reported that Alberts had an "improved mood" or "generally good mood."  See, e.g., R. 324, 326, 327, 329, 392.   At other times, Dr. Greene reports that Alberts "felt more depressed."  See, e.g., R. 325, 331.

On May 27, 2010, Dr. Fallon noted that Alberts had found a new psychiatrist, namely Dr. Greene, and that she was less depressed and less fatigued.  R. 358.  On August 27, 2010, Dr. Greene completed a Psychiatric/Psychological Impairment Questionnaire indicating that Alberts suffers from major depressive disorder and had a current Global Assessment of Functioning ("GAF") score of 45, stating her primary symptoms as "daily frequent tearfulness, frequent awakening at night, [and] poor concentration."[2]  R. 343-45.  Dr. Greene opined that despite Alberts's compliance with her medications and her "clubhouse services,"[3] Alberts "has been

---

[1] This gap coincides with Alberts's self-reported break from psychiatric treatment.  R. 31.

[2] A treating endocrinologist wrote four days later, on August 31, 2010, that Alberts reported she "feels her depression is well controlled, although on occasion she still has crying spells."  R. 374.

[3] Alberts testified that the "clubhouse" is a clubhouse for mentally impaired people that provided social and support services.  R. 32.

struggling with mental illness for many years" and it is "unlikely that she will be able to function in a job for the foreseeable future."  R. 350.  In his last treatment note dated January 11, 2011, Dr. Greene noted that Alberts reported a "good mood," that she was "sleeping well lately," and was "getting along well with her roommate."  R. 393.

On January 27, 2011, Dr. Greene completed a second Psychiatric/Psychological Impairment Questionnaire indicating that Alberts suffered from major depression and had a current GAF score of 55.  R. 395.  Dr. Greene stated that Alberts was "chronically depressed but recently her mood has been improved."  Id.  However, citing her history of mood fluctuation when under stress, Dr. Greene opined that Alberts is incapable of even low work stress and it is unlikely Alberts "will be unable to function at a job at this time and for the foreseeable future." R. 395, 402.  Dr. Greene noted that Alberts was taking the medications Temazepam, Cymbalta, Abilify, Clonidine, Trazodone, Topomax and Buspar.  R. 400.

b)     Diabetes, HBP and Cholesterol

Although not the focus of Alberts's disability claim either before the ALJ or on appeal, the Court briefly reviews Alberts's medical history related to diabetes, HBP and cholesterol since Alberts raised these conditions as a basis for her initial disability claim, R. 146, and the ALJ commented on these conditions in his findings, R. 15-16.

From December 11, 2007 to November 29, 2010, Alberts was treated at Caritas Medical Group where Dr. Fallon was her primary care physician.  R. 186-214, 352-366.  In his initial examination on December 11, 2007, Dr. Fallon noted that Alberts had been diagnosed with diabetes a year earlier and had a history of hypertension.  R. 186.  Dr. Fallon assessed that Alberts suffered from depression, hypertension and other medical issues and suggested some general health maintenance tests.  R. 187.  Alberts continued to be treated by Dr. Fallon for her

diabetes, hypercholesterolemia, hypertension and other general medical issues.  R. 186-214, 352-366.  On January 11, 2008, Dr. Fallon noted that Alberts's cholesterol was "still a little high" and increased her medication.  R. 209.  On August 8, 2008, Dr. Fallon reported that her diabetes was "in good control."  R. 193.  On December 5, 2008, Alberts received a complete physical exam from Dr. Fallon.  R. 376.   Dr. Fallon indicated that Alberts was suffering from diabetes, hypertension, and depression/posttraumatic stress disorder, among other maladies.  R. 377-78.  During this time, Alberts was prescribed Lisinopril, Topamaz, Effexor, Trazodone, Clonidine, Lisinopril, Lovastatin and Metformin.  R. 149, 186-89.  Alberts's primary care medical records continue until November 29, 2010, noting that Alberts was controlling her diabetes and hypertension through medication, diet and exercise.  R. 365.

2.      *RFC Assessments and Other Evaluations by Massachusetts Disability Determination Services*

In addition to Alberts's medical records, the ALJ had before him two mental and one physical RFC assessments dated November 19, 2008, June 12, 2009 and May 27, 2009 respectively, which were performed by three different medical consultants working for the Disability Determination Services ("DDS") department of the Massachusetts Rehabilitation Commission.  R. 259-62, 277-84, 299-302.  Dr. John Jao ("Dr. Jao") performed the physical RFC assessment.  R. 284.  Dr. Carol McKenna ("Dr. McKenna") performed the June 12, 2009 mental RFC evaluation apparently only from existing medical records, R. 297, which included a consulting evaluation by examining doctor Dr. Le M. Doan ("Dr. Doan") performed on October 17, 2008.  R. 255.  The ALJ also had Dr. Doan's evaluation before him in the record.[4]

_____

[4] The earlier November 19, 2008 mental RFC evaluation was performed by a different medical consultant and is not mentioned in the ALJ's decision.  That RFC evaluation provided an identical general evaluation except that it had evaluated Alberts as "not significantly limited" rather than "moderately limited" in the metric of "ability to work in coordination with or

Dr. Jao's physical RFC evaluations states that Alberts could occasionally lift and/or carry twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk with normal breaks for about six hours in an eight-hour workday, could sit with normal breaks for about six hours in an eight-hour workday, and was not otherwise limited in her ability to push and/or pull.  R. 278.  The physical RFC evaluation also indicated that her activities of daily living included "cooking, light cleaning, walking, use of public transportation, shopping in stores, reading[,] TV and social activities."  R. 278.

Dr. McKenna's mental RFC evaluation stated that Alberts was either "not significantly limited" or was "moderately limited" in all of the measured categories.  R. 299-300.  Under a section labeled "Functional Capacity Assessment" the RFC states that without substantial assistance, Alberts is: "A:  Able to comprehend & recall simple info & . . . B:  Complete same level tasks & with effort, sustain for 2 hr increments across an 8 hr day for 5 days/week.  C:  Likely to be sensitive to perceived criticism but is capable of adeq[u]ate [sic] social interaction overall.  D:  Able to adapt to routine change following a brief period of adjustment."  R. 301 (ellipsis in original).

3. *ALJ Hearing*

At the February 14, 2011 administrative hearing, the ALJ heard testimony from two witnesses, Alberts and a VE, James Sarnos.  Alberts testified that she had last worked on May 16, 2008, but had stopped after having an argument with her boss.  R. 29.  Alberts testified that her boss had asked Alberts to continue working "overnights," but that Alberts was unable to do so because she has "a dog that barks at night."  Id.  Alberts felt that her boss was "giving

proximity to others without being distracted by them."  Compare R. 259 with R. 299.  The earlier evaluation contains a similar evaluation.  Compare R. 261 with R. 301.  Only the later June 12, 2009 mental RFC, which presents a slightly stronger case for Alberts's disability claim, was a basis for the ALJ's RFC finding.  R. 37.

[Alberts] unreasonable things to do about the dog" and was "continually harassing [Alberts] about it." Id. Alberts testified that she "just couldn't take it anymore and left." Id. She reported that she hadn't worked since that time because of "issues with depression and extreme exhaustion [and] criticism" that cause her to "cry very easily [for five or ten minutes] at the lowest amount of pressure." R. 30, 33. Alberts testified that her days were spent sleeping, watching television or going to the "clubhouse" for mentally impaired people where she would talk with others, make cards or check e-mail. R. 31-32. She reported that she took break from her psychiatric treatment between June 2009 and February 2010 because she was in the process of a move. R. 31. Alberts reported that she was on medication to help her depression and was uncertain if her medication was causing her tiredness. R. 32. She testified to the ALJ that "exhaustion" would keep her from being able to hold a low stress job, and that she previously had found herself "falling asleep a lot on the night shifts" even when she was well-rested beforehand. R. 34-35. Alberts testified that she also had other problems, such as seeing images, and that she had difficulty concentrating, which prevented her from reading or finishing a television show. R. 33-34.

The VE testified next, and stated that Alberts had worked as a telephone answering service operator, which he described as a semi-skilled job with a sedentary exertion level, and as a general officer helper, which he described as unskilled job with a light exertion level. R. 36. The ALJ then presented the VE with a RFC of a hypothetical person and asked if that person would be able to work as a telephone answering service operator or as a general officer helper. D. 37. Specifically, the ALJ asked the VE to consider a hypothetical individual whose age ranged from 47 to 50; who had the same work experience as Alberts; whose exertion impairments are limited to the light level; who may only occasionally climb a ladder, rope or

scaffold; who may only occasionally kneel, crouch or crawl; who was able to comprehend and recall simple information and complete simple tasks with effort sustained for two-hour increments across an eight-hour day for five days a week; who was likely to be sensitive to perceived criticism, but is capable of adequate social interaction overall; and who was able to adapt to routine changes following a brief period of adjustment.  R. 37.  The VE responded that because the jobs of telephone answering service operator and general officer helper required more than the completion of simple tasks, the hypothetical individual would not be able to do those jobs.  R. 37.  The ALJ asked whether there would be unskilled jobs available to a hypothetical person with the given RFC and the VE replied yes, and identified "bottling line attendant," "light housekeeping" and "garment folder" as three such jobs that existed both in the national and state economies.  R. 37-38.

The ALJ then asked the VE to read a medical report written by Greene and provided by Alberts and was then asked if the medical evaluation was "disabling."  R. 38 (citing R. 343-50). The VE responded yes, and explained his answer.  R. 39.  The ALJ then asked the VE to assume that Alberts was credible in her testimony and whether on that assumption there were any jobs that the VE knew of that Alberts could perform.  Id.  The VE responded that based on this proffer, there would be no jobs that Alberts could perform on a competitive basis.  Id.  After Alberts's attorney conducted a short cross-examination of the VE with respect to the work involved in light housekeeping, R. 39-41, Alberts added that she had trouble doing her own housekeeping, R. 41, and the ALJ closed the hearing.  R. 42.

### 4.    Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Alberts had not engaged in substantial gainful activity since May 16, 2008.  R. 15.  At step two,

the ALJ found that Alberts suffered from two severe impairments:  major depressive disorder and obesity.[5]  R. 15.   The ALJ also noted that Alberts suffered from "diabetes mellitus, hyperlipidemia, and hypertension," but that these conditions were effectively managed with medication and diet and that the record contained no evidence that the signs or symptoms from these conditions had "more than minimally" affected Alberts's ability to work.  R. 15-16.   At step three, the ALJ found that Alberts did not have an impairment, singly or in combination, that was one of the "listed" impairments in the Social Security regulations requiring a finding of disablement.  R. 16-17.  Alberts does not challenge any of those findings.

Before proceeding to step four, the ALJ then determined that Alberts has the RFC "to perform light work" with a few noted limitations.  R. 17-21.  Alberts disputes this finding.  The ALJ found that the objective medical evidence supported this conclusion and found that Alberts's testimony was not credible in part where it described symptoms beyond what was supported by the medical evidence.  R. 18-20.  The ALJ recited the findings of Alberts's treating physician, Dr. Greene, as well as the findings by state agency consultants, Dr. Jao and Dr. McKenna, and state agency consulting examiner Dr. Doan.  R. 20-21.  The ALJ described Dr. Jao's RFC determination (as recited above) as to Alberts's physical capabilities and Dr. McKenna's RFC determination (as recited above) as to Alberts's mental capabilities.  Id.  The ALJ found that these two RFCs determined by state doctors were "well-supported by the record as a whole."  R. 21.

At step four, based on that RFC determination, the ALJ found that Alberts was unable to perform any past relevant work.  R. 21.  Alberts does not dispute this conclusion.  At step five,

---

[5] Alberts did not claim obesity as a disability.  R. 16, 146.  The ALJ noted that the claimant was 5'2'' tall, weighed 209 pounds and had a body mass index of 38.  He concluded that this rendered Alberts "obese" and since "obesity is considered a severe impairment, [the ALJ] took it into consideration in evaluating the claimant's [RFC]."  R. 16.

the ALJ determined that "considering [Alberts's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 22.  Alberts disputes the ALJ's ultimate conclusion that she is not disabled.

### C.   Alberts Challenges to the ALJ's Findings

Alberts contends that the ALJ's determination that Alberts is not disabled and has the RFC to perform "light work" was not supported by substantial evidence.  First, Alberts argues that the ALJ did not properly follow the treating physician rule and gave undue consideration to non-treating physician reports.   Second, Alberts argues that the ALJ failed to evaluate her credibility properly.   Finally, Alberts argues that the ALJ relied upon flawed VE testimony because the RFC given to the VE was flawed.  For the reasons discussed below, the Court finds no reversible error and affirms the ALJ's decision.

### 1.   ALJ's Evaluation of the Medical Opinions

Alberts first argues that the ALJ erred when he accorded minimal weight to the opinion of Alberts's treating psychiatrist, Dr. Greene.  Alberts also argues that the ALJ improperly relied on the opinion of the non-examining, non-treating state agency psychologist, Dr. McKenna, in determining Alberts's RFC.  The Court will examine the ALJ's use of each doctor's opinions in turn.

### a)   Treating Psychiatrist's Opinion:  Dr. Greene

The ALJ found that Dr. Greene's opinion was inconsistent with the record as a whole and with statements made by Alberts, and therefore, that Dr. Greene's opinion was only entitled to minimal probative weight.   R. 20-21.   Alberts argues that Dr. Greene's opinion is not inconsistent with the record, and therefore, that the ALJ was required to give the opinion controlling weight. Pl. Mem., D. 9 at 13.  Alberts also argues that even if the ALJ did not err in

refusing to give Dr. Greene's opinion controlling weight, the ALJ did not provide "good reasons" for rejecting Dr. Greene's opinions and "failed to weigh Dr. Greene's opinions under the factors in 20 C.F.R. § 404.1527(d)(2)-(6) and § 416.927(d)(2)-(6)." Id. at 13-14.

An ALJ should give controlling weight to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must determine the amount of weight to give the opinion based on the following six factors: (1) "[l]ength of treatment relationship and the frequency of examination," (2) "[n]ature and extent of the treatment relationship," (3) "[s]upportability" of the medical opinion, (4) consistency of the opinion "with the record as a whole," (5) "[s]pecialization" of the treating source, and (6) "other factors . . . that tend to support or contradict the opinion." Id. § 404.1527(c). In addition, the ALJ must "give good reasons" for the weight given to the treating source's opinions. Id. That is, the ALJ must give reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Social Security Ruling 96-2p, 1996 SSR LEXIS 9, at *12 (S.S.A. 1996); see Haggblad v. Astrue, No. 11-cv-028-JL, 2011 U.S. Dist. LEXIS 140274, at *21 (D.N.H. Nov. 17, 2011). The ALJ's reasons must also be supportable and reasonable. Haggblad, 2011 U.S. Dist. LEXIS 140274, at *22. The ALJ is not required to discuss each factor under 20 C.F.R. § 404.1527 in his decision, so long as he gives good reasons, supported by the evidence in the record, for the weight he ultimately gives to the treating physician's opinion. Crocker v. Astrue, No. 07-220-P-S, 2008 U.S. Dist. LEXIS 50201, at *30 (D. Me. June 30, 2008); see Delafontaine v. Astrue, No. 1:10-cv-027-JL, 2011

U.S. Dist. LEXIS 2794, at *53 (D.N.H. Jan. 7, 2011) (noting that "an ALJ is not required to methodically apply [the factors] so long as the ALJ's decision makes it clear that these factors were properly considered"); Braley v. Barnhart, No. 04-176-B-W, 2005 U.S. Dist. LEXIS 11070, at *12 (D. Me. June 7, 2005) (noting that "the plaintiff does not cite, nor can [the court] find, any First Circuit authority for the proposition that an [ALJ] must slavishly discuss each of these factors for his consideration of a treating-source opinion to pass muster").  The factors provide a balancing test, not a checklist.  See Conte v. McMahon, 472 F. Supp. 2d 39, 48-49 (D. Mass. 2007) (disagreeing with claimant that a "failure to address specifically each factor constitutes legal error" because the list "presents the quintessential balancing test" and stating that the ALJ did not "neglect[] to perform the balancing," but rather "chose to stress one factor[, consistency of the opinion with the record as a whole,] over the others").

Like the ALJ in Conte, the ALJ in the instant case focused on the inconsistency of Dr. Greene's opinions with the entirety of the record.  While the ALJ did not specifically address each individual factor, his opinion makes it clear that he balanced the statutory factors in determining how much weight to afford Dr. Greene's opinion.  First, as for length of treatment relationship and nature and extent of the relationship, the ALJ noted that Alberts did not begin treatment with Dr. Greene until February 2010.  R. 19; see also R. 31 (Alberts's testimony that she saw Dr. Greene monthly starting in February 2010), R. 395 (noting monthly visits with Dr. Greene from February 5, 2010 to January 11, 2011).  Second, as to supportability of the medical opinion, the ALJ noted that Dr. Greene gave Alberts Global Assessment of Functioning ("GAF") scores in the 40s and 50s and that the most recent score was a 55.  R. 19; see R. 395 (January 27, 2011 questionnaire scoring Alberts at a GAF score of 55).  A GAF score of 55 indicates that the patient has "moderate difficulty in social, occupational, or school functioning."  Pl. Mem., D. 9

at 3 n.6.   But as the ALJ noted, R. 21, Dr. Greene did not have access to Alberts's prior examination records, which, as described in detail below, painted a different picture of Albert's social and occupational functioning abilities, including her ability to maintain long-term relationships with a roommate and boyfriend and her volunteering in the business unit at the clubhouse.  See, e.g., R. 159, 226, 258-68.  The ALJ noted that "Dr. Greene did not have access to the full longitudinal evidence of record, which . . . indicat[es] that [Alberts] is not as limited as set forth in Dr. Greene's opinion."  R. 21; see 20 C.F.R. § 404.1527(d)(6) (stating that the ALJ shall consider "other factors" including "the extent to which [the source] is familiar with the other information in [the] case record").

In addition, there is substantial evidence in the record to support the ALJ's determination that Dr. Greene's opinions were inconsistent with record as a whole.[6]  First, as the ALJ discussed, a report from Dr. Doan, the DDS consultant who examined Alberts, indicates that Alberts has "a robust social life" and that "[her] symptoms do not limit her activities to the extent alleged."  R. 20.  Dr. Doan reported that Alberts spent time with friends, including her boyfriend, and participated in a variety of daily activities and that she "displayed appropriate attitude" and had a "pleasant and stable" mood.  R. 256-68.  Second, the ALJ noted that Alberts's own statements are inconsistent with Dr. Greene's opinion and suggest that Alberts "is not as limited as set forth in Dr. Greene's opinion."  R. 21; see, e.g., R. 159-62 (Social Security Administration Function report in which Alberts discusses going to the clubhouse, volunteering, visiting with friends on a daily basis, shopping and completing household chores); R. 226 (progress notes

---

[6] The ALJ is not required to discuss all of the evidence in the record.  Avery v. Astrue, No. 11-20100-DJC, 2012 U.S. Dist LEXIS 135824, at *32 (D. Mass. Sept. 21, 2012) (citing Frost v. Barnhart, 121 F. App'x 399, 400 (1st Cir. 2005)).  There is a presumption "that the ALJ has considered all of the evidence before him."  Miller v. Astrue, No. 2009-12018-RBC, 2011 U.S. Dist. LEXIS 64338 (D. Mass. June 16, 2011) (quoting Quigley v. Barnhart, 224 F. Supp. 2d 357, 369 (D. Mass. 2002)) (internal quotation marks omitted).

from WFCS noting that Alberts reports that she volunteers in the business unit at the clubhouse); R. 374 (August 31, 2010 letter from an examining physician noting that "[Alberts] feels her depression is well controlled, although on occasion she still has crying spells"); R. 31 (Alberts's testimony discussing a more than six-month break in her treatment to move to a new apartment and "take care [of] other things related to the move"); R. 31-32 (Alberts's testimony discussing going to the clubhouse for five hours a day and living with her roommate, and stating that the medicine is "helping [but] not totally curing" her depression).   Third, Dr. Greene's treatment notes also support the ALJ's conclusion that Alberts is not as limited as Dr. Greene's opinion states.   See e.g., R. 324 (July 22, 2010 treatment note stating that Alberts's mood is improved and that she has been exercising at the YMCA); R. 392 (December 10, 2010 treatment note stating that Alberts mood is "good," she is dating, and her concentration is improving); R. 393 (January 11, 2011 treatment note stating that Alberts "report[s] a good mood[,] . . . has been sleeping well lately . . . getting along well with her roommate[,] and regularly attending her clubhouse" and indicating changes to her medication to help her concentration); R. 395 (January 27, 2011 psychiatric questionnaire stating that Alberts is unable to function in a job, but also noting that while she is "chronically depressed . . . recently her mood has been improved").   For all these reasons, it was not reversible error for the ALJ to afford minimal weight to Dr. Greene's opinion.

In support of his decision to give Dr. Greene's opinion minimal weight, the ALJ also noted that "the ultimate determination of disability is a matter reserved to the Commissioner under Social Security regulations (20 CFR 404.1527; SSR 96-5P)."  R. 21.  Alberts argues that this was improper because Dr. Greene's analysis was a medical opinion, and not an opinion on an issue reserved to the Commissioner.  Pl. Mem., D. 9 at 11.  The Social Security regulations

reserve the decision of whether an individual is disabled for the Commissioner.   20 C.F.R § 404.1527(d)(1); see Avery, 2012 U.S. Dist LEXIS 135824, at *31 (noting that the ALJ's statement that the "decision of whether [plaintiff] is disabled is a decision reserved to the Commissioner . . . correctly reflects the law").   "A statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine that [the claimant is] disabled."  20 C.F.R § 404.1527(d)(1).  Dr. Greene's statements that "[i]t is unlikely that [Alberts] will be able to function in a job for the foreseeable future" are opinions regarding Alberts's ability to work.  See R. 395, 402.  Thus, the ALJ was correct that, while he is required to consider the opinion of the treating source, the decision regarding Alberts's disability is ultimately for the ALJ to determine.  See 20 C.F.R § 404.1527(d)(1); Social Security Ruling 96-5p, 1996 SSR LEXIS 2, at *6 (S.S.A. 1996) (stating that while "opinions from any medical source on issues reserved to the Commissioner must never be ignored," such opinions "are never entitled to controlling weight or special significance").  The ALJ properly considered the opinion of Dr. Greene but, as noted above, afforded it minimal weight after considering the record as a whole in making his determination of disability.

> b)      Non-Examining, Non-Treating Psychologist's Opinion:
> Dr. McKenna

Alberts next argues that the ALJ erred by relying on the opinions of the non-examining state agency psychologist, Dr. McKenna, in determining Alberts's RFC.  Pl. Mem., D. 9 at 11-12.  When making an RFC determination, the ALJ considers the medical opinions in conjunction with all other relevant evidence in the record.  See 20 C.F.R. § 404.1527(b); Moore v. Astrue, No. 11-cv-11936-DJC, 2013 U.S. Dist. LEXIS 28865, at *20 (D. Mass. Mar. 2, 2013).  In general, less weight is given to the opinion of a non-examining medical source than that of an examining source.  20 C.F.R. § 404.1527(c)(1).  However, "nontreating, nonexamining sources

may override treating doctor opinions, provided there is support for the result in the record." Haggblad, 2011 U.S. Dist. LEXIS 140274, at *22 (quoting Shaw v. Sec'y of Health & Human Servs., 25 F.3d 1037 (unreported table decision), No. 93-2173, 1994 U.S. App. LEXIS 14287, at *13 (1st Cir. 1994)) (internal quotation mark omitted). The ALJ must give an explanation for the amount of weight given to the non-treating, non-examining source's opinion, just as he must do for a treating physician's opinion. 20 C.F.R. § 404.1527(e)(2)(ii). In analyzing the opinion of a nonexamining source, the ALJ must consider the same factors used to consider the treating physician's opinion "such as the consultant's medical specialty and expertise in [the SSA's] rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of opinions." Id.

The ALJ relied on Dr. McKenna's opinion because it was "well-supported by the record as a whole." R. 21. Dr. McKenna's psychiatric review indicates that she had evaluated Alberts's medical records from January 26, 2007 to June 12, 2009 (the date of McKenna's evaluation) and that she reviewed the WFCS records as well as Dr. Doan's DDS evaluation. R. 297. The Court agrees with the ALJ's assessment that Dr. McKenna's opinion is consistent with the medical record as a whole. First, Dr. McKenna's assessment that Alberts is able to "comprehend and recall simple information," "complete same level tasks" and "sustain for two-hour increments," R. 21, 301, is supported by the progress notes from Alberts's treatment at WFCS as well as other evidence in the record. See, e.g., R. 215 (August 21, 2008 WFCS progress report noting that Alberts says she has been working in the business unit at the clubhouse); R. 256-57 (medical examination report from Dr. Doan discussing Alberts's daily living activities and mental status). Second, Dr. McKenna's assessment that Alberts is "capable of adeq[u]ate [sic] social interaction

overall," R. 301, is supported by Alberts's ability to participate in daily activities and maintain relationships. See, e.g., R. 215 (August 21, 2008 WFCS progress note stating that Alberts described being around people and working in the business unit at the clubhouse as a "godsend"); R. 226 (July 3, 2008 WFCS progress note stating that Alberts's "affect is bright which [Alberts] attributes to socialization at social club"); R. 219 (July 1, 2008 psychiatric evaluation stating that Alberts "thinks that getting out of the house helps [her] energy and mood"); R. 312 (WFCS progress note stating that Alberts "reports benefits of being around people at [the] social club and also appreciates the structure); R. 324, 392 (treatment notes from Dr. Greene stating that Alberts has been "dating");  R. 309 (January 28, 2009 treatment note discussing how Alberts reported that she has been dating the same man since August 2008). Finally, Dr. McKenna's opinion that Alberts is "able to adapt to routine changes following a brief period of adjustment," R. 21, 301, is supported by the record. See R. 31 (Alberts's testimony explaining that the gap in her psychiatric treatment from June 2009 to February 2010 was due to moving apartments and taking care of issues related to the move).  Therefore, the ALJ's decision to rely on Dr. McKenna's opinion in formulating the RFC was supported by substantial evidence in the record and does not merit reversal.

2. *Credibility*

Alberts argues that the ALJ failed to evaluate properly her credibility.  Pl. Mem., D. 9 at 14-18.  "Credibility determinations, while the sole responsibility of the ALJ, 'must be supported by substantial evidence[,] and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant].'"  Carr v. Astrue, No. 09-10502-NG, 2010 U.S. Dist. LEXIS 104973, at *15 (D. Mass. Sept. 30, 2010) (quoting Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)); Becker v. Sec'y of Health & Human

Servs., 895 F.2d 34, 36 (1st Cir. 1990) (giving weight to the ALJ's credibility determinations because the ALJ has the opportunity to view the witnesses and has special expertise and knowledge of subject matter).  The ALJ here found that Alberts's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." R. 18.  Alberts argues that the ALJ erred in four ways by making this determination.

First, Alberts argues that the "ALJ applied the incorrect legal standard . . . by finding her not credible to the extent her testimony conflicted with a pre-determined [RFC]." D. 9 at 16. Second, Alberts argues that "the ALJ's reasons for finding [Alberts] not credible are not supported by substantial evidence."  Id.  Third, Alberts argues that the ALJ gave undue consideration to Alberts's lack of hospitalization and to her improvement while on medication. Id. at 16-17.  Fourth, Alberts alleges that the ALJ failed to recognize Alberts's "work history" as a factor that should have positively informed the ALJ's credibility determination of Alberts's testimony.  Id. at 17.  The Court considers the first two arguments together since they are logically related.

a)  The ALJ's Legal Standard and Evidentiary Support

The Court concludes that the ALJ did use the correct legal standard and that his findings regarding Alberts's credibility were properly supported by substantial evidence.  The Court agrees with Alberts that the ALJ could not take his own RFC determination as a starting point and use it as a litmus test to evaluate whether Alberts's statements were credible.  See, e.g., Longerman v. Astrue, No. 11 CV 383, 2011 U.S. Dist. LEXIS 125162, at *43 (N.D. Ill. Oct. 28, 2011) (observing that "[a]s the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not 'turns the credibility determination

process on its head'" (quoting <u>Brindisi v. Barnhart</u>, 315 F.3d 783, 787-88 (7th Cir. 2003)));

<u>Smollins v. Astrue</u>, No. 11-CV-424 (JG), 2011 U.S. Dist. LEXIS 98257, at *37 (E.D.N.Y. Sept.

1, 2011) (holding that the ALJ "merely compared [claimant's] statements regarding her

symptoms to his own RFC assessment [and thus] failed to follow the dictates of the Social

Security regulations in performing his credibility assessment").

But it is clear that the ALJ did not do this and that his statement regarding Alberts's

credibility with respect to the RFC was commentary to explain the scope of a credibility

determination that he had already made using the correct legal standard to evaluate her

statements.  As the ALJ recognized, in considering a claimant's symptoms, he had to:

> follow a two-step process in which it must first be determined whether there is an
> underlying . . . impairment . . . that could reasonably be expected to produce [the
> claimant's symptoms].  Second, [where that] has been shown, the [ALJ] must
> evaluate the intensity, persistence, and limiting effects of the claimant's
> symptoms to determine the extent to which they limit [her] functioning. For this
> purpose, whenever statements about the intensity, persistence, or functionally
> limiting effects of pain or other symptoms are not substantiated by objective
> medical evidence, the [ALJ] must make a finding on the credibility of the
> statements based on a consideration of the entire case record.

R. 18; Social Security Ruling 96-7p, 1996 SSR LEXIS 4, at *5-6; 20 C.F.R §§ 404.1529(c),

416.929(c).   Here, the ALJ performed the first step, and found that Alberts's "medically

determinable impairments could reasonably be expected to cause the alleged symptoms."  <u>Id.</u>

The ALJ next found that the extent of Alberts's alleged "intensity, persistence and limiting

effects" was not fully supported by objective medical evidence.  R. 18-19.  The ALJ then

proceeded with his credibility determination to evaluate those symptoms that went beyond the

objective medical evidence.  <u>Id.</u>

The ALJ correctly recognized that "[b]ecause a claimant's symptoms can sometimes

suggest a greater level of severity of impairment than can be shown by the objective medical

evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors [an ALJ] must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements."  R. 19; <u>see also</u> Social Security Ruling 96-7p, 1996 SSR LEXIS 4, at *1-7; 20 C.F.R §§ 404.1529(c), 416.929(c).  The ALJ then listed and analyzed those factors, which as he correctly noted, include:  (1) "[t]he individual's daily activities," (2) "[t]he location, duration, frequency, and intensity of the individual's pain or other symptoms," (3) "[f]actors that precipitate and aggravate the symptoms," (4) "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms," (5) "[t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms," (6) "[a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board)," and (7) "[a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."  R. 20 (quoting Social Security Ruling 96-7p, 1996 SSR LEXIS 4, at *3); <u>see</u> 20 CFR §§ 404.1529(c), 416.929(c); <u>Avery v. Dept. of Health and Human Servs.</u>, 797 F.2d 19, 29 (1st Cir. 1986).

Here, the ALJ considered each of these factors in his opinion, even if he did not explicitly map each piece of evidence he cited into one of the aforementioned seven factors.  The ALJ cited evidence including Alberts's testimony that she cooked, performed light household tasks, shopped, cared for her dog, read books, watched television and spent time at the clubhouse. R. 20 (citing R. 31-32, 159-166); <u>see also</u> R. 256-257 (Dr. Doan's October 17, 2008 evaluation). He noted that Alberts reported to Dr. Doan that she spoke with family members nearly every day, she often spoke with friends and family, she often went out to eat with family and friends

and that she occasionally corresponded with friends using letters and electronic mail.  R. 20 (citing 256-57); cf. Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (observing that "evidence of daily activities can be used to support a negative credibility finding") (citing Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 429 (1st Cir. 1991)).

The ALJ noted Alberts's symptoms included "sadness, crying spells, sensitivity to criticism," "difficulty concentrating" and "constant fatigue and tiredness despite a full night of sleep."  R. 18 (citing R. 30, 143, 146, 159-66).  The ALJ noted that Alberts testified that she felt that her difficulty in dealing with criticism "would frequently [lead to] 5-10 minute crying spells in the bathroom" and "had significantly contributed to her inability to sustain consistent employment over the past several years."  R. 18 (citing R. 30).  The ALJ noted that Alberts was on a "regimen of medication," listed the specific drugs in his opinion, and noted that Alberts was unsure if her "fatigue and tiredness" stemmed from her impairment or from her regimen of medication.  R. 18-19 (citing R. 32, 348).  The ALJ noted that Alberts had not been hospitalized due to her mental impairment and that her medical records indicated that treatment with medications had been at least partially successful in "reducing her symptoms."  R. 19 (citing R. 219, 235, 239, 329, 392).  The ALJ also noted the non-medication treatment that Alberts had been receiving, including counseling sessions.  R. 19 (citing R. 215-47, 303-23, 294-402).  The ALJ also noted that the record reflected "a significant gap in the claimant's history of mental health treatment from June 2009 through February of 2010, which Alberts explained in her testimony was due to the fact that she had moved and "had to take care [of] other things related to the move and stuff like that."  R. 19, 31.

Here, it is apparent from the ALJ's decision that the ALJ properly identified the relevant legal framework, considered Alberts's statements in light of the entire record, considered the

factors relevant to assessing Alberts's credibility and concluded from the record that Alberts's own testimony was not fully credible regarding the "intensity, persistence, or functionally limiting effects" of symptoms not supported by objective medical evidence.  See 20 C.F.R. § 404.1529(c).  Although Alberts argues that the ALJ improperly did not evaluate the "consistency of [her] statements . . . with the evidence of the record," this argument is belied by both the form and the substance of ALJ's decision, which found "that the objective medical evidence of record is not entirely consistent with the claimant's allegations regarding her impairments" and evaluated Alberts's statements against other evidence in the record.

The ALJ also concluded that the objective evidence was consistent with DDS's RFC determinations that the ALJ credited, R. 21 (noting that "Dr. Jao's and Dr. McKenna's [RFC] opinions . . . are both well-supported by the record as a whole"), and that Alberts's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the [RFC]," R. 18.  Alberts argues that this last statement is reversible error.  Read in context of all of the ALJ's analysis and the entire opinion, the reference to credibility and the RFC was shorthand for stating that after applying the correct legal standard, the ALJ had found that the sum of the evidence established that the DDS RFC determination accurately reflected the true state of Alberts's functional limitations and Alberts's self reports of same did not.  See Teixeira, 755 F. Supp. 2d at 347 (affirming ALJ's credibility determination of claimant's testimony "insofar as it was reasonably consistent with the objective medical evidence"); Social Security Ruling 96-7p, 1996 SSR LEXIS 4, at *12 (stating that an ALJ "need not totally accept or totally reject the individual's statement [but may] find an individual's statements, such as statements about the extent of functional limitations or restrictions due to pain or other symptoms, to be credible to a certain degree").  The Court finds no error, where the

ALJ applied the proper legal standards and his determinations were supported by substantial evidence.

b)      Alberts's Hospitalization and Treatment

The Court finds that the ALJ did not give undue consideration to Alberts's lack of hospitalization and her improvement on medication.  Alberts argues that the ALJ's "conclusion that her treatment was conservative because she was never hospitalized and her medications improved her functioning" was not the issue, where the issue was "whether Alberts's "functioning improved to a degree that she could perform work activities."  Pl. Mem., D. 9 at 16-17.   Alberts argues that both reference to the lack of hospitalization and purported characterization of her treatment as conservative was error.  Id. at 17.

But the ALJ never described Alberts's treatment as conservative.  The ALJ's reference to the lack of hospitalization was made in the context of describing Alberts's treatment to highlight a perceived inconsistency between Alberts's testimony and the objective medical evidence suggesting that Alberts only received some "treatment[, and] with a significant gap in the middle," and yet was able to engage in normal activities of daily living.  That inconsistency went entirely to Alberts's credibility regarding her testimony about alleged symptoms beyond what was otherwise supported by the record.  See Social Security Ruling 96-7p, 1996 SSR LEXIS 4, at *15-17 (requiring the ALJ to consider "the degree to which the individual's statements are consistent with . . . information about medical history and treatment . . . and observations by other persons concerning the individual's daily activities"); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (considering "gaps in the medical record as 'evidence'" as to severity of symptoms).  The Court finds no error.

c)      Alberts's Work History

Alberts also argues that the ALJ failed to recognize Alberts's work history as a factor weighing on credibility. Alberts's argument is that because she worked every "nearly every year since 1979" that this entitles her to "substantial credibility when claiming an inability to work." D. 9 at 17; R. 123 (earnings history). Alberts and the Commissioner both note that the First Circuit has not addressed whether one's work history should inform a credibility determination. D. 9 at 17; D. 12 at 19 n.6. Circuits that have addressed work history as a factor in evaluating credibility do so in part on the basis that a long "prior work history justifies the inference that when [a claimant] stop[s] working [the claimant] did so for the reasons testified to." Singletary v. Sec'y of Health, Ed. & Welfare, 623 F.2d 217, 219 (2d. Cir. 1980); see also O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003). Even if the Court accepts that rationale, Alberts's direct testimony and her counseling records suggest that Alberts stopped working for reasons unrelated to her disability.

As the ALJ noted in his decision, R. 19, Alberts testified that she stopped working after having an argument with her boss regarding Alberts not wanting to work "overnights" because her dog would be up barking all night. R. 19; R. 29. Furthermore, while not stated in the ALJ's opinion, Alberts's counseling records show that in April 2008, just prior to leaving her job, Alberts reported that she wanted a new job, and in June 2008, Alberts reported that she was concerned that she would not receive unemployment benefits or disability benefits because she left her job "under [her] own free will." R. 227 (WFCS progress note of June 26, 2008); R. 238 (WFCS progress note of April 18, 2008). In February 2009, the counseling notes reflect that Alberts was resistant to obtaining a part-time job "due [to] possible repercussions from the government, i.e., denial of SSI." R. 307. All of this direct evidence was before the ALJ, and would tend to counter any substantial inference about the credibility of Alberts's claims based

27

upon her past work history.  See Social Security Ruling 96-7p, 1996 SSR LEXIS 4, at *15-17 (requiring the ALJ to consider "the degree to which the individual's statements are consistent with . . . observations by other persons concerning the individual's . . . efforts to work.")  In fact, the ALJ did take note of Alberts's work history, but found that it was not a positive factor.  R. 19 (noting that Alberts's "work history – and the nature of her separation from her most recent employer – does not tend to support her allegations of a disabling medical condition"). Accordingly, the Court finds no error.

### 3. *Vocational Expert's Testimony*

Alberts argues that the ALJ erred in relying on the VE's testimony that Alberts could work in the state and national economy because the VE's testimony was based on an allegedly flawed RFC provided by the ALJ.  Pl. Mem., D. 9 at 18.  Giving a flawed RFC to a VE undermines the relevance of the VE's testimony.  Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).  Here, Alberts argues that the RFC was flawed because it "was based entirely upon the unsupported opinion of [Dr. McKenna]."  D. 9 at 18.  But as already discussed above, the RFC determined by the ALJ and then given to the VE was supported by substantial evidence in the record.  Accordingly, the ALJ did not commit reversible error in relying on the VE's opinion as to Alberts's ability to work in the local or national economy.

## V.      Conclusion

Based on the foregoing, the Commissioner's motion for an order affirming his decision, D. 11, is GRANTED and Alberts's motion for judgment on the pleadings, D. 8, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge